IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LILLIE M. WILLIS, | ) |
| Plaintiff, | ) |
| | ) Case No. 04 C 1502 |
| v. | ) |
| CITY OF CHICAGO, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Lillie M. Willis ("Willis") brought a two-count First Amended Complaint against Defendant City of Chicago ("City") alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and disability discrimination in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* On March 24, 2005, Willis voluntarily dismissed her disability claim. Before the Court is the City's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) as to the sexual harassment claim. For the following reasons, the Court grants the City's motion.[1]

---

[1] On July 25, 2005, Willis' counsel informed the Court that she did not intend to file a response to the City's summary judgment motion because no witnesses whose testimony supported Willis' case were willing to work with her. As such, counsel contended that there was no way to successfully defend the City's motion. Because Willis did not file a response to the City's motion for summary judgment and accompanying statement of material facts pursuant to Local Rule 56.1, the City's facts are deemed admitted. *See Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003); *see also Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir. 2005) (to avoid summary judgment, non-moving party must file response to moving party's statement).

## UNDISPUTED FACTS

### I. Willis' Employment with City of Chicago

On May 14, 1985, Willis began working for the Chicago Department of Transportation ("CDOT") as a bridge operator. (R. 39-1, Defendant's Motion for Summary Judgment and Rule 56.1 Statement of Facts, ¶¶ 8, 9.) Willis' immediate supervisor, Darryl Rouse, has been the Superintendent of Operations for Bridges with CDOT since 1994. (*Id.* ¶¶ 10, 11.) Willis has also had three rotating supervisors, including Jim Frobes, Lawson Brown, and Ray Damarjian. (*Id.* ¶ 12.) These supervisors' duties include assisting on boat runs, picking up time sheets and daily reports, assisting in checking bridge houses, and reporting problems to Superintendent Rouse. (*Id.* ¶ 13.) From 1993 until 2003, Stan Kaderbeck was Chief Engineer/Deputy Commissioner of Bridges and Transit for CDOT and served as Superintendent Rouse's supervisor. (*Id.* ¶ 14.)

### II. The 92nd Street Bridge Tower (West)

On April 4, 1997, Willis found copies of Hustler magazine in the bathroom shared by men and women bridge operators at the west bridge tower located at 3300 East 92nd Street. (*Id.* ¶¶ 16, 17.) Willis did not know who left the magazines in the bathroom and complained about the magazines to Superintendent Rouse on or about April 8 or 9, 1997. (*Id.* ¶¶ 18, 19.) Rouse had the offensive magazines removed within two days of Willis' complaint. (*Id.* ¶ 20.)

On April 11, 1997, Willis filed a written complaint concerning the magazines with the City of Chicago Sexual Harassment Office. (*Id.* ¶ 21.) Thereafter, the Sexual Harassment Office conducted an investigation into Willis' complaint that included witness interviews and an on-site investigation. (*Id.* ¶ 22.) As a result of its investigation, the Sexual Harassment Office sustained

Willis' complaint. (*Id.* ¶ 23.)

Superintendent Rouse then issued a memorandum on September 22, 1997, stating that sexually suggestive materials were prohibited in the workplace, and ordered any such materials discarded. (*Id.* ¶ 24.) Rouse also ordered that the memorandum be conspicuously posted at all bridge control towers and checked to make sure that the memorandum was posted as ordered. (*Id.* ¶¶ 25, 26.) After Rouse had the offensive magazines removed in April of 1997, Willis did not encountered any more offensive magazines at the west bridge tower at 3200 East 92nd Street. (*Id.* ¶ 27.)

### III.    Dearborn Street Bridge Tower

In 1998 or 1999, while working at the Dearborn Street bridge tower, Willis found a page torn from a men's magazine depicting a nude female with Willis' name written on it. (*Id.* ¶¶ 28, 31.) Willis reported the incident to Superintendent Rouse who issued a memorandum to other employees concerning the incident. (*Id.* ¶¶ 29, 30.) Rouse also sent Willis to talk to Andra Gomberg and her staff at the City of Chicago Sexual Harassment Office, where they informed Willis that they would investigate the incident. (*Id.* ¶ 30.) Willis does not know who left the magazine page at the Dearborn Street bridge tower. (*Id.* ¶ 31.)

### IV.    East Grand Avenue Trailer

In 1998 or 1999, at the East Grand Avenue trailer, Willis found some Hustler magazines. (*Id*. ¶ 33.) She also noted that someone had posted three or four photographs of nude people torn from the magazines. (*Id*.) Willis reported the magazines and pictures to Superintendent Rouse. (*Id.* ¶ 35.) Although Willis cannot say that anyone intentionally left the magazines for her, she believes that the tradesmen who were assigned to a construction project at East Grand Avenue

3

left the pictures. (*Id.* ¶¶ 36, 37, 38.) In response to Willis' complaint, Rouse issued another memorandum. (*Id*. ¶ 40.) At her deposition, Willis testified that Rouse investigated her complaint to the fullest extent possible. (*Id.* ¶ 41.)

## V. Kinzie Street Bridge Tower

When Willis arrived at the Kinzie Street bridge tower on or around May 28, 2003, she found the door to the bridge tower ajar. (*Id.* ¶¶ 42, 43.) She then found a pair of women's underwear by the bridge tower door. (*Id.* ¶¶ 42, 44.) Willis notified Superintendent Rouse about the underwear. (*Id.* ¶ 47.) In addition, Willis notified Gomberg at the Sexual Harassment Office. (*Id.* ¶ 49.) Willis did not know who left the underwear at the Kinzie Street bridge tower. (*Id.* ¶ 50.) Meanwhile, rotating supervisor Jim Frobes investigated Willis' complaint. (*Id.* ¶ 48.)

Thereafter, Donald O'Malley, Employee Relations Supervisor for CDOT, issued a memorandum reminding bridge operators and trades employees of the City's policy prohibiting sexual harassment, and advising them that the display of inappropriate articles of clothing at bridge towers was prohibited. (*Id.* ¶ 52.) Since May 2003, Willis has not found additional materials, such as offensive magazines or articles of clothing, at any of the bridge locations. (*Id.* ¶ 53.)

## VI. Other Incidences

### A. Clogged Toilets

On more than one occasion, the bathroom toilets at the shared bathrooms in the Kinzie and Franklin Street bridge towers were clogged. (*Id.* ¶¶ 55, 57.) Whenever Willis encountered a clogged toilet, she reported it to Superintendent Rouse, who would then call to have it repaired.

4

(*Id.* ¶¶ 58, 59.) Further, the City had new toilets installed at the Kinzie and Franklin Street bridge towers. (*Id.* ¶ 61.) Willis believes, but does not have evidence to prove, that the clogged toilets constituted harassment directed at all bridge operators by the machinists or other tradesmen. (*Id.* ¶ 62.) Willis does not know who clogged the toilets or if the toilets were intentionally clogged. (*Id.* ¶ 56.)

### B. Dead Fish

In the summer of 2004, Willis found a dead fish on the garbage can near the Kinzie Street bridge tower and believes that the fish was left for her. (*Id.* ¶¶ 64, 65.) Willis called Superintendent Rouse about the dead fish. (*Id.*, Ex. E., Rouse Dep. at 62.) At her deposition, Willis testified that the incident with the dead fish never interfered with her ability to perform her job duties. (*Id*. ¶ 66.)

### C. Telephones

Willis also reported broken telephones to Superintendent Rouse after which Rouse rectified the problem. (*Id.* ¶¶ 76, 77.) Willis does not know if the telephones were intentionally broken nor does she know why they malfunctioned. (*Id*. ¶ 78.) In her deposition, Willis admitted that the problems with the telephones were not discriminatory. (*Id*. ¶ 79.)

### D. Co-workers' Conduct

In the late 1990s at the Randolph Street bridge tower, while Willis' co-worker, Ed Buckner, was eating breakfast, Willis said to him, "Why would you eat something like that, because it's a lot of cholesterol, cheese, eggs, and things like that." (*Id.* ¶ 82.) Buckner replied to Willis to "mind your own business, bitch." (*Id.* ¶ 83.) After Willis reported this incident, Superintendent Rouse posted memoranda reminding employees to refrain from using derogatory

remarks.  (*Id*. ¶¶ 84, 85.)

In or around August 2002, Willis overheard a conversation between her co-workers, John Fairman and Otis Howard, in which Fairman referred to Willis' "fat ass."  (*Id*. ¶ 67.)  Willis complained to Superintendent Rouse about the remark and Rouse sent Fairman a written reprimand.  (*Id.* ¶¶ 68, 69.)  In or around June 2004, while at Loomis Street bridge tower, Fairman asked Willis not to sit at the bridge controls because he wanted privacy to speak on the telephone and told her to go downstairs.  (*Id.* ¶ 70.)  Rouse responded to this complaint by holding a face-to-face meeting with Fairman at which Willis was present.  (*Id.* ¶ 71.)  Rouse informed Fairman that he could not tell anyone what to do on the job site.  (*Id.*)  Willis testified that by speaking to Fairman, Rouse helped to improve Fairman's behavior.  *(Id*. ¶ 73.)  Further, since Rouse spoke to Fairman, he has not made any similar comments to Willis.  (*Id*. ¶ 74.)

In the spring of 2004, another co-worker, Dennis White, told Willis that she should "carry her ass home if she can't perform the job."  (*Id.* ¶ 80).  From Willis' deposition testimony, it is unclear in what context White made this statement.  (*Id.,* Ex. D, Willis Dep. at 185-87.)  Willis also testified that her co-worker, Kevin Servicen, played his radio too loudly and listened to "Manchow" on the radio.  (*Id*. ¶ 81, Ex. D, Willis Dep. at 188-89.)  After Willis complained to Superintendent Rouse about Servicen, Rouse told Servicen that he could not listen to "Manchow" on City property.  (*Id*.)

## VII. EEOC Charge

Willis filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on August 4, 2003.  (*Id.* ¶ 6.)  In her EEOC Charge, Willis alleged that while she has worked for the City, she has been sexually harassed despite her

complaints to Human Resources.  (*Id.*, Ex. C.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  In determining whether a genuine issue of material fact exists, the Court construes all facts and reasonable inferences in a light most favorable to the non-moving party. *Id.* at 255.  Even where all of the material facts are undisputed, as in this case, the Court must still determine whether judgment is proper as a matter of law. *See Johnson v. Gudmundsson,* 35 F.3d 1104, 1112 (7th Cir. 1994).

## ANALYSIS

**I.      Statute of Limitations**

Under Title VII, a plaintiff must file an employment discrimination charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 104-05, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  In general, federal courts only consider evidence from this 300-day period when making Title VII determinations, however, because the statute of limitations is not jurisdictional, it is subject to equitable considerations. *See Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 860 (7th Cir. 2005); *Dandy v. United Parcel Serv., Inc.,* 388

F.3d 263, 270 (7th Cir. 2004).

The City contends that because Willis did not file her EEOC charge until August 4, 2003, any actionable conduct is limited to the incidences occurring after October 8, 2002, which was 300 calendar days prior to her EEOC charge. *See Dandy,* 388 F.3d at 270. The City also contends that Willis cannot establish a continuing violation because the alleged discriminatory acts occurred in two, unrelated "clusters."

A plaintiff may establish a continuing violation if separate acts of discrimination are part of an ongoing pattern and at least one of the acts occurred within the relevant limitations period. *See Morgan,* 536 U.S. at 120; *Dandy,* 388 F.3d at 270. When determining whether a continuing violation claim is actionable, the Court examines (1) whether the acts involve the same subject matter, (2) the frequency with which the conduct occurred, and (3) the degree of permanence of the alleged discriminatory conduct that should trigger an employee's awareness to assert her rights. *See Tinner v. United Ins. Co. of Am.,* 308 F.3d 697, 708 (7th Cir. 2002).

The first occurrence of alleged sexual harassment occurred in 1997 when Willis found copies of Hustler magazine at the 92nd Street bridge tower. Next, Willis found some Hustler magazines and photographs of nude people posted on the wall at the East Grand Avenue trailer in 1998 or 1999 and also found a nude picture from a men's magazine at the Dearborn Street bridge tower during the same time period. In the late 1990s, one of Willis' co-workers told her to "mind your own business, bitch" after Willis made a remark about his breakfast.

The next alleged incident of sexual harassment happened over two years later in 2002 when Willis' co-worker referred to her "fat ass." After that, Willis found women's underwear and a dead fish at the Kinzie Street bridge tower, Willis' co-worker asked her to leave the

8

Loomis Street bridge tower, another co-worker told her to "carry her ass home if she can't perform the job," and a co-worker listened to "Manchow" too loudly on the radio.[2]

Based on these two separate "clusters" of incidences, the Court would be hard-pressed to conclude that Willis has established a continuing violation. As discussed in further detail below, the incidences that occurred from 1997 until 2004 were infrequent and isolated. *See Tinner,* 308 F.3d at 708. Moreover, the two sets of incidences are not related. *See id.* For example, there were no occurrences after 1998 concerning men's or Hustler magazines. Also, the comment made by her co-worker at the Randolph Street bridge in the late 1990s, concerning Willis minding her own business, was separate in time and place from other co-workers' comments. Finally, the more than two-year separation between the late 1990s incidences and the occurrences starting in 2002 weighs heavily against finding a continuing violation. *See Lucas v. Chicago Transit Auth.,* 367 F.3d 714, 727 (7th Cir. 2004) (citing *Selan v. Kiley,* 969 F.2d 560, 567 (7th Cir. 1992)).

As such, the Court will not consider the incidences occurring before 2002 in determining Willis' hostile work environment claim because Willis has failed to establish that these actions constitute a continuing violation. *See Beamon,* 411 F.3d at 860 (equitable tolling in Title VII actions is applied sparingly).

## II. Hostile Work Environment Claim

The Court thus turns to the merits of Willis's Title VII hostile work environment claim based on conduct occurring after 2001. Title VII makes it unlawful for an employer "to fail or

---

[2] From the record, it is unclear when the clogged toilets and malfunctioning telephones occurred.

9

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Accordingly, Title VII prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

To prevail on her hostile work environment claim, Willis must demonstrate that (1) she was subjected to unwelcome sexual harassment, (2) the harassment was based on her sex, (3) the sexual harassment was severe and pervasive enough to unreasonably interfere with her work performance by creating an intimidating, hostile, or offensive work environment, and (4) there is a basis for the City's liability. *Moser v. Indiana Dept. of Corr.,* 406 F.3d 895, 902 (7th Cir. 2005); *Kriescher v. Fox Hills Golf Resort & Conference Ctr.,* 384 F.3d 912, 915 (7th Cir. 2004). The Court turns to the third and fourth prongs of this test because they are dispositive.

### A.     Hostile Work Environment

To qualify as hostile, a work environment must be objectively and subjectively offensive. *Racicot v. Wal-Mart Stores, Inc.,* ___ F.3d ___, ___, 2005 WL 1560332, at *2 (7th Cir. July 5, 2005). In other words, the alleged conduct must be sufficiently severe that the plaintiff subjectively thought it hostile and that a reasonable person would find it hostile, as well. *Kriescher,* 384 F.3d at 915. When evaluating whether a work environment is hostile, courts examine all of the surrounding circumstances, such as the frequency and severity of the discriminatory conduct, whether the conduct was physically threatening or humiliating or just offensive, and whether the conduct interfered with the employee's work performance. *Racicot,*

10

2005 WL 1560332, at *2; *Moser*, 406 F.3d at 902.

Viewing the facts in a light most favorable to Willis, the record does not support the conclusion that Willis' work environment was so severe and pervasive as to constitute a hostile work environment. *See Kriescher,* 384 F.3d at 915. The handful of occurrences that Willis contends constitute sexual harassment occurred over a two year period and include two co-workers' isolated comments, finding women's underwear and a dead fish, and malfunctioning telephones and clogged toilets.[3]

First, not only were her co-workers' comments infrequent and isolated, Willis has not established that the comments "fat ass" and "carry her ass home if she can't perform the job," plus her co-worker's request that she go downstairs, are gender-related, and thus these comments cannot support Willis' hostile work environment claim based on sex. *See Berry v. Delta Airlines*, 260 F.3d 803, 809-10 (7th Cir. 2001) (although gender-based conduct need not be overtly sexual, conduct must be motivated by gender). Even if the comments were gender-related, they do not rise to the level of actionable conduct. *See, e.g.*, *Patt v. Family Health Sys., Inc.,* 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaints of eight gender-related comments, including "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (sporadic use of abusive language and gender-related jokes did not amount to actionable

---

[3] At her deposition, Willis testified that one time at the Randolph Street bridge tower a couple of male employees rubbed up against her, but that she did not take offense from a sexual standpoint. (Def.'s Stmt. ¶¶ 88, 89.) Instead, she explained that she does not like anyone touching her. (*Id.* ¶ 89.) Because Willis does did not subjectively believe that this conduct was sexual in nature, the Court need not address this incident when examining whether Willis' work environment was sexually hostile. *See Kriescher,* 384 F.3d at 915.

harassment).

As to the clogged toilets and malfunctioning telephones, Willis fails to specify when these occurrences happened. Therefore, these incidences are insufficient to defeat summary judgment. *See Lucas,* 367 F.3d at 725-26 (undated, unspecific assertions do not demonstrate hostile work environment). Furthermore, Willis admits that the malfunctioning telephones were not discriminatory and does not know who clogged the toilets or if the toilets were clogged intentionally. Instead, Willis believes that the clogged toilets constituted harassment directed at all the bridge operators. Under such circumstances, courts treat "second-hand" harassment as less objectionable than harassment directed a plaintiff. *See Moser,* 406 F.3d at 903. In any event, without more, Willis has not established that the clogged toilets and malfunctioning telephones constituted gender-based harassment directed at her.

Finally, Willis does not give the Court enough information about finding the dead fish and women's underwear to determine if they contributed to a hostile or offensive work environment that unreasonably interfered with her work performance. *See Moser,* 406 F.3d at 902. For instance, Willis does not know who left the fish or the underwear. Even if the dead fish had her name next to it as Willis claims, Willis admitted at her deposition that the incident with the dead fish never interfered with her ability to perform her job duties. In fact, Willis testified that none of the alleged incidences of sexual harassment interfered with her work performance. (*See* Def.'s Stmt. Facts, ¶ 15.)

As the Supreme Court has noted, Title VII is not a code of general civility for the workplace, as such, offhanded and isolated comments do not amount to actionable conduct. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see*

*also Berry*, 260 F.3d at 808 (Title VII not a general civility code designed to purge workplace of boorish conduct). Here, the facts in the record do not support the conclusion that Willis' work environment was sexually hostile. Instead, the facts reveal "a limited number of incidents that are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot,* 2005 WL 1560332, at *2. Accordingly, Willis has failed to establish that the alleged sexual harassment was so severe and pervasive as to unreasonably interfere with her work performance by creating an intimidating, hostile, or offensive work environment. *See Kriescher,* 384 F.3d at 915 (plaintiff failed to present evidence that reasonable person would find workplace hostile to female employees).

### B. Employer Liability

The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor or co-worker. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Harassment by a supervisor triggers strict liability subject to any affirmative defenses. *McPherson v. City of Waukegan,* 379 F.3d 430, 438 (7th Cir. 2004). Harassment by a co-worker, on the other hand, leads to employer liability only where the plaintiff proves that the employer was negligent in discovering or remedying the harassment. *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005). Because there is no evidence in the record that Willis' supervisors sexually harassed her, the Court examines Willis' allegations of co-worker harassment to determine the City's liability.

Willis reported all but one of the incidences to Superintendent Rouse. Therefore, the Court need not determine whether the City was negligent in discovering the alleged harassment as to these reported claims. *See id.* The Court thus examines whether the City's responses to the

13

allegations of harassment were "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002) (citation omitted); *see also Berry,* 260 F.3d at 811 (if employer takes reasonable steps to rectify the harassment, it has discharged its legal duty).

Here, the City took reasonable steps to remedy the alleged harassment. For example, after Willis reported finding the women's underwear at the Kinzie Street bridge tower, supervisor Jim Frobes investigated her complaint. Thereafter, Donald O'Malley, CDOT's Employee Relations Supervisor, issued a memorandum reminding bridge operators and trades employees of the City's policy prohibiting sexual harassment and advising them that the display of inappropriate articles of clothing at bridge towers was prohibited. Since May 2003, Willis has not found additional materials, such as offensive magazines or articles of clothing, at any of the bridge locations.

After Willis complained about the clogged toilets and broken telephones, Superintendent Rouse had the toilets and phones repaired. In fact, new toilets were installed at the Kinzie and Franklin Street bridge towers. In addition, after Willis complained to Superintendent Rouse about her co-worker playing the radio too loudly and listening to "Manchow" on the radio, Rouse told the co-worker that he could not listen to "Manchow" on City property.

Likewise, after Willis' co-worker, John Fairman, referred to her "fact ass," Rouse sent a written reprimand to Fairman. After Fairman told Willis to go downstairs, Rouse held a face-to-face meeting with Fairman with Willis present. At that meeting, Rouse informed Fairman that he could not tell anyone what to do on the job site. In addition, Willis testified that by speaking

14

to Fairman, Rouse helped improve Fairman's behavior. In fact, since Rouse spoke to Fairman, he has not made any similar comments to Willis.

Next, there is nothing in the record indicating that Willis reported her co-worker's comment that she should "carry her ass home if she can't perform the job" to her supervisors or to the City's Sexual Harassment Office. Indeed, Willis has not provide enough information regarding this comment to analyze whether the City was negligent in discovering it. *See Cerros*, 398 F.3d at 952. More importantly, because Willis fails to give any details as to the context in which this statement was made, this comment alone is simply not gender-related. *See McKenzie v. Milwaukee County,* 381 F.3d 619, 625 (7th Cir. 2004) (citation omitted) (mere use of coarse language does not constitute harassment). This comment simply does not support Willis' allegations of sexual harassment in the first instance. *See Berry,* 260 F.3d at 808 (inappropriate conduct inflicted regardless of sex is outside gambit of Title VII).

Finally, although Superintendent Rouse did not respond to Willis' dead fish complaint, Rouse's failure to respond to this complaint does not support employer liability. More specifically, when Willis reported this incident to Rouse, she did not provide "enough information to make a reasonable employer think there was some probability that she was being sexually [or racially] harassed." *Cooper-Schut v. Visteon Auto. Sys.* 361 F.3d 421, 426 (7th Cir. 2004) (citation omitted). As such, the City cannot be held liable for failing to respond to this incident. *See id.*

Viewing the evidence in a light most favorable to Willis, the City was not negligent in responding to Willis' complaints and it took reasonable steps to remedy her various complaints. Accordingly, the City is not liable for any co-worker conduct. *See Berry,* 260 F.3d at 811.

## **CONCLUSION**

For these reasons, the Court grants Defendant's Motion for Summary Judgment.

Dated:  August 1, 2005

                      **ENTERED**

                      _____
                      **AMY J. ST. EVE**
                      **United States District Court Judge**